# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Case No. 2:12-CR-55(4)
Judge Gregory L. Frost

FREDERICK CARTER,

    Defendant.

## ORDER

This matter came on for a hearing this 24th day of August, 2012 upon Defendant's Motion to Suppress Evidence Seized on November 17, 2011 (ECF No. 121) filed on August 15, 2012 and upon the Government's Response (ECF No. 123) filed on August 17, 2012.

## I. FACTS

Defendant, counsel for Defendant, and counsel for the Government appeared. The Government presented the testimony from two witnesses. Defendant elected to present no testimony. From the testimony presented and the evidence admitted, the Court finds the facts to be as follows:

Detective John Whitacre, a detective in the Columbus, Ohio Police Department and assigned to the Strategic Response Bureau, was investigating the distribution of narcotics in the Mount Vernon Avenue and 17th Avenue area within the City of Columbus. That area was described as a high crime area involving violent crimes and drug trafficking. Detective Whitacre had received complaints from patrol officers and citizens in the area concerning the sale of heroin. Detective Whitacre had previously made hundreds of undercover narcotics purchases in

1

the area. A confidential informant had provided information to Detective Whitacre that several individuals were selling heroin in that neighborhood and one was known as "Paco" who was later identified as Defendant. According to Detective Whitacre, the confidential informant had provided accurate and verifiable information in the past. The confidential informant indicated that Defendant was supplying heroin to a drug house and was also selling heroin on the street. According to the confidential informant, Defendant was living near Mount Vernon Avenue and Monroe Avenue. The confidential informant provided Detective Whitacre with Defendant's cellular telephone number and Detective Whitacre obtained a cellular telephone GPS on the phone through which Detective Whitacre was able to verify that Defendant lived at 327 North Monroe Avenue.

During this same period of time, the same confidential informant advised Detective Whitacre that heroin was being sold out of a residence located at 401 Taylor Avenue in Columbus, Ohio. Officers set up and conducted surveillance on that residence that revealed a considerable amount of foot traffic and vehicle traffic at 401 Taylor Avenue residence. The officers observed several known heroin addicts enter the 401 Taylor Avenue residence and leave quickly which was consistent with narcotics transactions. It was verified that Arnett Smotherman who had previously been arrested for heroin related offenses, owned the house. A relative of Smotherman and Bryan Johnson who had been identified by the confidential informant as a heroin supplier, also used the residence.

A search warrant was obtained to search the residence at 401 Taylor Avenue. The search warrant was executed on October 25, 2011. The search revealed a large amount of heroin packaged in foil balls indicative of the manner that, as the officers knew, the residents of 401

2

Taylor Avenue packaged their heroin. The officers also found a room with paraphernalia used to package the heroin. Three firearms and over $5000.00 in cash were also seized from the residence.

The search warrant was executed at a time that the officers knew Arnett Smotherman was not at the house. They knew that because they had installed a GPS tracking device on his vehicle. Detective Whitacre explained that they believed that bulk amounts of heroin was coming from another residence and they were interested in finding the other residence. By executing the search warrant at a time that Arnett Smotherman was not at the residence, the officers believed that Mr. Smotherman would lead them to the house where the bulk of the heroin was stored because he would not use the 401 Taylor Avenue residence any longer. The plan was successful.

The tracking device indicated that Arnett Smotherman began going to a residence at 823 Rich Street on the west side of Columbus. He began to frequent that residence on a daily basis. Surveillance was then conducted on that house on almost an every day basis. The officers observed Arnett Smotherman, Bryan Johnson and others frequent the house. Two individuals observed at the 823 Rich Street address were thought to be heroin distributors.

On November 4, 2011 the officers followed Bryan Johnson from the Rich Street residence back to the area of Mount Vernon Avenue and 18th Avenue which had been the area of officers initial focus. The officers observed Bryan Johnson enter a door to an apartment complex on 18th Avenue just south of Mount Vernon Avenue. He was followed by Defendant. Ten to fifteen seconds later both walked out of the apartment complex. Bryan Johnson left the area in his automobile and Defendant walked to his residence at 327 North Monroe. Based upon their

observations and their familiarity with drug investigations, the officers believed that a drug transaction had just occurred between Defendant and Bryan Johnson. This belief was based upon hundreds of previous similar observations and subsequent arrests.

Thereafter, on November 7, 2012, the officers searched the trash from a trash container at 823 Rich Street. The trash pull revealed drug paraphernalia and packaging material used to package heroin. Based upon the evidence obtained from the trash pull, Detective Whitacre believed that the heroin distributors were now operating out of the Rich Street residence and that gave credence to the belief that the meeting observed between Defendant and Bryan Johnson was, indeed, a drug transactions.

On November 11, 2011 the officers observed Bryan Johnson leave the Rich Street residence and he was later observed in the area of Mount Vernon Avenue and 18th Avenue. Johnson exited his vehicle and went into the same apartment building that he had previously gone into on November 4, 2011. Defendant followed him into the apartment complex. The two of them were there only ten to fifteen seconds and then they both exited. Bryan Johnson returned to his car and left the area just as he did before. Two officers suspected that another drug transaction had occurred. Detective Whitacre called to Officer Wildman who was in the area in a police cruiser. Detective Wildman informed Officer Wildman of the suspected drug transaction, the location of Defendant, and what Defendant was wearing. Officer Wildman proceeded to the area just as Defendant was jay walking across Mount Vernon Avenue. Defendant saw the cruiser and turned around and walked back to the sidewalk. The cruiser passed Defendant, Defendant crossed the street, and then Officer Wildman turned around and drove up to Defendant.

Detective Whitacre described the area of the stop as a high crime area with a lot of narcotic activity, gang activity, and "lots of weapons." Detective Whitacre related that there had been a lot of shootings in the area and that it was a "pretty bad area." He also related that during his career when he stopped individuals for suspicion of narcotic trafficking they frequently were armed with guns.

Officer Wildman testified next. He confirmed that the area where Defendant was stopped was a high crime area involving narcotic trafficking and that it was a violent crime area. He also testified that he worked with Detective Whitacre in the past and when Detective Whitacre related in the past that he had observed a drug transaction that information proved to be accurate.

Officer Wildman indicated that he initially saw Defendant in the middle of the street, that he passed him, and then he made a u-turn and gradually pulled his cruiser over to the side of the street where Defendant was then walking on the sidewalk. The officer stated that Defendant appeared nervous and when he exited his cruiser Defendant took three steps backwards and then turned and began running from the officer. Officer Wildman shouted to Defendant, "Don't run. Don't run. I know you have a gun. I know you have a gun." Officer Wildman explained that he has used that technique several times because a suspect will normally react by stopping and indicating that he does not have a gun. Defendant reacted by immediately laying face down on the sidewalk and extending his hands away from his body. This prompted the officer to believe that Defendant actually had a gun. Officer Wildman approached Defendant, turned Defendant onto his left side, and felt around his belt line where he felt the butt of a handgun in Defendant's waistband. Officer Wildman testified that it was not unusual to find a handgun when he had stopped persons suspected of drug trafficking in the past. Defendant was then arrested and

5

handcuffed. He stood up and a subsequent search revealed that Defendant possessed heroin.

Officer Wildman indicated that there were three indicators that led him to pat down Defendant. First, Detective Whitacre's statements that he had observed a narcotics transaction. Second, Defendant's apparent nervousness upon the officer approaching Defendant. And, third, Defendant's initial attempt to flee the officer.

## II. ANALYSIS

The foregoing facts regarding the investigation, stop, and seizure are uncontested. Defendant requests that this Court suppress the gun and heroin found on Defendant's person. The Government maintains that the stop, pat-down, and seizure was constitutional and that the evidence should not be suppressed. The Court agrees with the Government. It is the interpretation and significance of those facts as well as the interpretation of the applicable law upon which the parties disagree.

The Government correctly cites the applicable law:

The modicum of proof required to establish a lawful investigative detention or *Terry*-stop is well know. Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008 ) (quoting *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)). Reasonable suspicion must be considered "under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir.

6

2007) (quoting *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003)). "Courts and law enforcement officers must look beyond the possibility of innocent behavior to determine whether the facts support a reasonable suspicion of criminality." *Hoover v. Walsh*, 682 F.3d 481, 496 (6th Cir. 2012). Law enforcement officers are entitled "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002)(internal quotation omitted). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred." *United States v. Campbell*, 549 F.3d 364, 370-71 (6th Cir. 2008) (internal citations omitted). "In considering the totality of the circumstances, '[a court] must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately.'" *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (additional citation omitted)).

It is also well-established that an officer may conduct a stop based on information obtained by fellow officers. *United States v. Barnes*, 910 F.2d 1342, 1344 (6th Cir. 1990) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). Often referred to as either the "collective knowledge" or "fellow officer" rule, this rule simply acknowledges the practical reality that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another." *Hensley*, 469 U.S. at 231 (quotation omitted). Because officers "must often act swiftly [and] cannot be expected to cross-examine their fellow

7

officers about the foundation of transmitted information," a reviewing court imputes collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop. Id. at 230-233; *see also Whiteley v. Warden*, 401 U.S. 560, 568 (1971).

Whether conveyed by police bulletin or dispatch, direct communication or indirect communication, the collective knowledge doctrine may apply whenever a responding officer executes a stop at the request of an officer who possesses the facts necessary to establish reasonable suspicion. *Dorsey*, 517 F.3d at 396. By imputing the investigating officer's suspicions onto the responding officer, without requiring the responding officer to independently weigh the reasonable suspicion analysis, the collective knowledge doctrine "preserves the propriety of the stop" and avoids crippling restrictions on our law enforcement. *United States v. Ibarra-Sanchez*, 199 F.3d 753, 760 (5th Cir. 1999).

In a case decided on July 25, 2012, *United States v. Lyons*, 2012 FED App. 0229P (6th Cir.) (Attached), a panel of the 6th Circuit recently endorsed the 7th Circuit's analytical framework for application of the collective knowledge doctrine of identifying three separate inquiries: (1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) (citing *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)).

Defendant directs the Court to *United States v. Williams*, 615 F.3d 657 (6th Cir. 2010) for the proposition that the motion to suppress should be granted. That case is not factually relevant

8

to the case *sub judice*. In the *Williams* case, the officers lacked any reasonable, articulable suspicion based upon specific, objective facts relating to the Defendant. In this case, this Court finds that the officers had reasonable, articulable suspicion that Defendant had been and was engaged in criminal activity which permitted the officers to stop and briefly detain Defendant. Further, under the circumstances, Officer Wildman was justified in conducting a limited pat-down of Defendant for the officers own protection. That pat-down revealed the concealed weapon which precipitated the arrest of Defendant which, in turn, led to the search and discovery of the contraband. Rather than criticize the actions of the officers, this Court finds that the thorough investigation of the totality of the facts by these officers should be commended. The officers did not rush to judgment but painstakingly developed the factual predicate for the arrest of Defendant

What are the facts that provided the officers with the reasonable, articulable suspicion that Defendant had been and was engaging in illegal activity.

1. Complaints from officers and citizens in the Mount Vernon Avenue and 18th Avenue area that heroin was being sold in that neighborhood;

2. The neighborhood was known to be a drug trafficking area;

3. A confidential informant, who had provided reliable information in the past advised Detective Whitacre that several individuals were selling heroin in the area and Defendant was one of the individuals;

4. The confidential informant indicated that Defendant was supplying heroin to a known drug house and he was also selling heroin on the street;

5. Through telephone records it was verified that Defendant lived in the area;

9

6. Surveillance confirmed that heroin was being sold out of the residence located at 401 Taylor Avenue;

7. Arnett Smotherman, Bryan Johnson, and others were operating a heroin selling business out of the 401 Taylor Avenue;

8. The search of 401 Taylor Avenue pursuant to a search warrant verified the heroin trafficking information;

9. Arnett Smotherman's GPS tracking device led the officers to the 823 Rich Street address;

10. Arnett Smotherman and Bryan Johnson frequented the Rich Street property;

11. Officers observed Bryan Johnson leave the Rich Street residence and proceed to the area of Mount Vernon Avenue and 18th Avenue where he met Defendant and where they had a brief encounter in an apartment complex that appeared to be a trained observer to have the characteristics of drug transaction;

12. A search of the trash container from 823 Rich Street revealed drug paraphernalia and heroin packaging material;

13. Officers observed Bryan Johnson again leave the Rich Street property and proceed to the apartment complex in the are of Mount Vernon Avenue and 18th Avenue and again meet with Defendant inside the complex for ten to fifteen seconds. This meeting was described by Detective Whitacre as fitting the profile of a drug transaction;

14. The officers observed Defendant walk from the apartment complex to Mount Vernon Avenue where he began to cross the street but turned back when he saw

     Officer Wildman's police cruiser; and

 15. Defendant appeared nervous and attempted to flee Officer Wildman when he stopped his cruiser and approached Defendant.

The collective knowledge of all of the officers involved unquestionably provided Detective Whitacre and Officer Wildman with reasonable suspicion that illegal drug activity was afoot. The totality of the circumstances provided the officers with much more than a mere hunch. The officers possessed a particularized and objective basis for specifically suspecting that Defendant was involved in illegal drug activity. The officers are permitted to draw on their own experiences and specialized training to arrive at that conclusion. The attempted brief detention of Defendant was proper.

The next issue is whether Officer Wildman possessed specific articulable facts that justified a pat-down for weapons. The Court finds that he did. The facts justified the pat-down are as follows:

 1. Officer Wildman knew that the area of the stop was a high crime area involving violent crimes;

 2. Officer Wildman knew that drug traffickers frequently carried handguns;

 3. Officer Wildman knew Defendant was suspected of recent drug activity;

 4. Defendant appeared nervous when Officer Wildman approached Defendant in his cruiser;

 5. Defendant attempted to flee when Defendant was approached after Officer Wildman exited his cruiser; and

 6. When told to, ""don't run, I know you have a gun," Defendant immediately laid

down on the sidewalk and moved his hands away from his body.

These specific articulated facts testified to by Officer Wildman clearly provided a basis for Officer Wildman to believe that Defendant was armed. The pat-down of Defendant revealed the butt of a handgun which was immediately apparent to the officer. The warrantless seizure of the handgun was justified which thereafter resulted in Defendant's arrest. The search of Defendant incident to that arrest revealed the heroin

## III.  CONCLUSION

The facts of this case presents much more than an inchoate and unparticularized suspicion or hunch as argued by Defendant and as found in *United States v. Williams*, *infra*. The facts of this case presents articulable facts that led to a reasonable suspicion that Defendant was involved in illegal activity which justified the attempted brief detention. Officer Wildman's general knowledge of the area and the characteristics of a drug trafficker along with the actions of Defendant provided sufficient facts to justify the minimal intrusion of the pat-down and the seizure of the weapon. Defendant's arrest was therefore proper and the search incident to that arrest which revealed the heroin was also proper.

Defendant's Motion to Suppress is found to be not well taken and the Court **DENIES** the same.

**IT IS SO ORDERED.**


 /s/   Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE